Patrick J. Schiltz, United States District Judge
Defendant Bryan Scott Erickson previously pleaded guilty to receiving child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). On July 19, 2018, the Court sentenced Erickson to 75 months' imprisonment and 10 years' supervised release; the Court deferred a decision on restitution. The parties have been unable to reach an agreement on restitution, so the matter is back before the Court.
The government seeks restitution for seven victims who were depicted in the child pornography that Erickson received. Specifically, the government requests $3,000 for two of Erickson's victims ("Sarah" from the "Marineland" series and "Cindy"), and $2,000 for five other victims ("Angela," "Maureen" from the "Lighthouse" series, "Pia" from the "Sweet Sugar" series, "Emily" from the "Tightsngold" series, and "Vicky"). Erickson concedes *1088 that he owes restitution, but objects to the government's requested amounts. Erickson proposes no alternative restitution amounts, but instead asks the Court to use its "abundant discretion" to fashion appropriate awards.
On March 12, 2019, the Court held an evidentiary hearing and, with respect to each victim, examined the factors identified by the United States Supreme Court in Paroline v. United States , 572 U.S. 434, 134 S. Ct. 1710, 188 L.Ed.2d 714 (2014). Based on the evidence submitted at the hearing, the Court orders Erickson to pay a total of $12,500 in restitution-specifically, $3,000 to Cindy and to Sarah from the Marineland series, $2,000 to Angela and to Emily from the Tightsngold series, $1,500 to Pia from the Sweet Sugar series, $1,000 to Maureen from the Lighthouse series, and nothing to Vicky.
A. Standard of Review
Restitution is mandatory under 18 U.S.C. § 2259.[1] Section 2259 requires that all defendants convicted of crimes involving the sexual exploitation of children (including defendants who, like Erickson, are convicted of receiving child pornography) pay restitution to their victims. Each victim is entitled to restitution covering the full amount of her losses, including:
(A) medical services relating to physical, psychiatric, or psychological care;
(B) physical and occupational therapy or rehabilitation;
(C) necessary transportation, temporary housing, and child care expenses;
(D) lost income;
(E) attorneys' fees, as well as other costs incurred; and
(F) any other losses suffered by the victim as a proximate result of the offense.
18 U.S.C. § 2259(b)(3)(A)-(F).
In Paroline , the Supreme Court set forth a framework for determining how much of a victim's total losses should be paid by a particular child-pornography defendant. The Court suggested that "district courts might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images ... then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." Paroline , 134 S. Ct. at 1728. The Court explained that the following factors "could" serve as "rough guideposts" in the relative-causal-significance inquiry:
[T]he number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.
Id.
Whatever its theoretical appeal, the Paroline framework is very difficult-if not *1089 impossible-to apply in practice.[2] For example, while trial judges, prosecutors, and defense attorneys may have anecdotal evidence about the popularity of a particular child-pornography series (based on how often the judges or attorneys have worked on cases involving the series), there is simply no way for any judge or attorney to make a "reasonable prediction[ ]" about "the broader number of offenders involved" or "the number of future offenders likely to be caught and convicted[.]" Paroline , 134 S. Ct. at 1728. Billions of people around the globe now have access to the Internet, and technology is advancing rapidly and unpredictably. Those who view child pornography do so furtively, and law-enforcement resources are extremely limited, meaning that only a tiny fraction of those who view child pornography are detected, even fewer are prosecuted, even fewer are ordered to pay restitution, and even fewer actually make restitution payments. Courts can know only that the number of past, present, and future offenders is "tragically large." Id. at 1734 (Roberts, C.J., dissenting); see also DiLeo , 58 F. Supp. 3d at 245 (stating that it is hard to imagine how estimating the number of offenders involved "could be more than a wild guess" (citation omitted)).
Even Paroline 's suggested "starting point"-"the amount of the victim's losses caused by the continuing traffic in the victim's images"-is nearly impossible for courts to reliably ascertain. Identifying this starting point requires a court to "disaggregate" the harm caused to the victim by the sexual abuse from the harm caused to the victim by the trafficking of the images of the sexual abuse .[3] This is akin to trying to disaggregate the harm that a person suffers from being born with fetal alcohol syndrome from the harm that the same person suffers from being orphaned at a young age from the harm that the same person suffers from being sexually abused by a foster parent from the harm that the same person suffers from becoming addicted to methamphetamine as a teenager. Each of these factors undoubtedly causes harm, but it is impossible to precisely (or even imprecisely) ascertain the relative degree of harm caused by each factor.[4]
*1090 Understandably, then, the Eighth Circuit has "decline[d] to transform" the disaggregation factor "from a 'rough guidepost' into a 'rigid formula.' " United States v. Bordman , 895 F.3d 1048, 1059 (8th Cir. 2018) (quoting Paroline , 134 S. Ct. at 1728 ). This Court has reviewed the record-including evidence of purported disaggregation submitted by some of Erickson's victims[5] -and attempted to "roughly" disaggregate the victims' losses.
Some of the Paroline factors can be applied more reliably. In this case, for example, there is no evidence that Erickson was involved in the production, reproduction, or distribution of any depiction of any of these victims. Further, all of the depictions of these victims received by Erickson were still images, not videos. See Bordman , 895 F.3d at 1058-59 (indicating that it matters whether the child pornography at issue is a video or image, and whether it contains particularly "sever[e]" depictions). These factors tend to place Erickson on the less culpable end of the spectrum of offenders who have contributed to these victims' losses.
As to each victim specifically:
B. Angela
Erickson received seven images of Angela. Gov. Ex. 1 at 9. The government requests $2,000 in restitution (ECF No. 45 at 7); Angela herself seeks $12,000 (Gov. Ex. 2 at 0001); and Erickson has not proposed a specific amount.
Angela estimates that her total losses are in the range of $1,511,045 to $1,621,545.[6] Of this amount, $60,000 to $120,000 is for "educational opportunities," based on the opinion of Angela's psychologist that Angela "would benefit from a small classroom with low student to teacher ratios." Id. at 0015. Also included in the lost-future-income estimate is anticipated loss caused by Angela not "reach[ing]
*1091 higher levels" of her occupation, "such as [being a] supervisor[ ]." Id. at 0023. The Court finds these two particular estimates-for smaller class sizes and for not advancing within her occupation-to be unduly speculative. The Court therefore finds that a reliable estimate of Angela's total losses is $639,045 to $689,545.
It is unclear how much of these losses Angela has recovered to date, but it appears to be very little. As of 2014, Angela had not received any payments, even though an unknown number of defendants had been ordered to pay restitution to her.[7] Gov. Ex. 2 at 0005-06.
The prosecutor noted at the hearing that Angela is "one of the more widely traded [child-pornography] series"-anecdotal evidence that is consistent with this Court's own impression-and thus the Court anticipates that the number of future offenders who will be involved in trafficking Angela's images will be large.
Erickson's causal role in Angela's losses is quite limited. Erickson received multiple images of Angela (seven), but he was not involved in the production, reproduction, or distribution of any of Angela's images. Considering Angela's seemingly significant outstanding total losses, but also Erickson's "relative role in the causal process that underlies [Angela's] general losses," the Court finds that $2,000 is an appropriate amount of restitution.
C. Cindy
Erickson received 32 images of Cindy. Gov. Ex. 1 at 25. The government requests $3,000 in restitution (ECF No. 45 at 7); Cindy herself seeks $8,000 (Gov. Ex. 8 at 1141); and Erickson has not proposed a specific amount.
Cindy estimates that the amount of her losses is $856,650.58 to $1,608,707.58. See Gov. Ex. 8 at 1134-35; Gov. Ex. 3 at 0097. The Court finds that this number is generally reliable, but excludes $23,698.73[8] attributable to medical expenses that were incurred prior to 2010 (when Erickson's relevant conduct started). After deducting these pre-2010 costs, the Court finds that a reliable estimate of Cindy's total losses is $832,951.85 to $1,585,008.85.
The Court has no evidence as to how many outstanding restitution orders there are for Cindy, or how much restitution she has received to date. At the hearing, the prosecutor noted anecdotally that Cindy's images are widely distributed, so the Court expects the number of future offenders to be large.
Erickson's causal role in Cindy's losses is very limited. Erickson received many more images of Cindy (32) than other victims, but he was not involved with producing, reproducing, or distributing any of Cindy's images. Considering Cindy's seemingly significant outstanding total losses, but also Erickson's very limited contribution to those losses, the Court finds that $3,000 is an appropriate amount of restitution.
D. Lighthouse (Maureen)
Erickson received a single image of Maureen, who is featured in the Lighthouse series. Gov. Ex. 1 at 57. The government requests $2,000 in restitution (ECF No. 45 at 7); Maureen herself seeks *1092 $10,000 (Gov. Ex. 4 at 0308); and Erickson has not proposed a specific amount.
The Court finds that $170,200 to $189,700 is a reliable estimate of Maureen's total losses. While Maureen submitted other loss estimates-and while her estimates are quite modest ($20,000 in transportation expenses, $10,000 in medication expenses, $250 in educational expenses, $3,000 in child care expenses, $72,500 in lost wages, and $20,000 in attorney's fees)-she lacks evidence supporting these estimates. Gov. Ex. 4 at 0310-11. Instead, her attorneys simply submitted their own estimates of these expenses. Id. The only estimate backed by evidence is the estimate of psychological-treatment expenses. See id. at 0351-52. The Court finds the estimated treatment expenses of $170,200 to $189,700[9] to be reliable, but cannot make a similar finding with respect to any of the other estimates.
The Court has no evidence as to how many outstanding restitution orders there are for Maureen, or how much in restitution she has received to date. The Court does know, albeit anecdotally, that the Lighthouse series is widely distributed.
Erickson's causal role in Maureen's losses is extremely limited. He received a single image of Maureen, and he was not involved with producing, reproducing, or distributing any of Maureen's images. Considering Maureen's relatively low estimated losses, and Erickson's extremely limited causal role, the Court finds that $1,000 is an appropriate amount of restitution.
E. Marineland (Sarah)
Erickson received 13 images of Sarah, who is featured in the Marineland series. Gov. Ex. 1 at 61. The government requests $3,000 in restitution (ECF No. 45 at 7); Sarah herself seeks $15,000 (Gov. Ex. 5 at 0354); and Erickson has not proposed a specific amount.
Sarah estimates her total losses at $5,729,094.76 to $7,076,807.76.[10] Included in that estimate, however, is $3,313,843 for the "loss of enjoyment of life." The government concedes-and the Court finds-that loss of enjoyment of life is not compensable under § 2259. Subtracting that element, the Court finds that $2,415,251.76 to $3,762,964.76 is a reliable estimate of Sarah's total losses.
As of the date of the hearing, Sarah had received $527,180 in restitution payments (ECF No. 50 at 1), leaving her with total outstanding losses of $1,888,071.76 to $3,235,784.76. The Court is anecdotally aware that the Marineland series appears frequently in child-pornography cases prosecuted in federal court, and thus the Court anticipates that the number of future offenders will be large.
Erickson's role in causing Sarah's losses is very limited. He received multiple images of Sarah (13), but he was not involved with producing, reproducing, or distributing any of her images. Considering Sarah's significant outstanding losses, but also Erickson's very limited causal role, the Court finds that $3,000 is an appropriate amount of restitution.
*1093 F. Sweet Sugar (Pia)
Erickson received two images of Pia, who is featured in the Sweet Sugar series. Gov. Ex. 1 at 88. The government requests $2,000 in restitution (ECF No. 45 at 7); Pia herself seeks $5,000 (Gov. Ex. 6 at 0662); and Erickson does not propose a specific amount.
Pia estimates her total losses as $91,900.[11] Pia has already received at least $46,691.44 in restitution from federal and state courts, leaving her total outstanding losses at approximately $45,208.56. Gov. Ex. 6 at 0663.
Erickson's role in causing Pia's losses is extremely limited. He received just two images of Pia, and he was not involved in producing, reproducing, or distributing Pia's images. Considering the relatively modest amount of Pia's outstanding losses, and Erickson's extremely limited causal role, the Court finds that $1,500 is an appropriate amount of restitution.
G. Tightsngold (Emily)
Erickson received one image of Emily, who is featured in the Tightsngold series. Gov. Ex. 1 at 92. The government requests $2,000 in restitution (ECF No. 45 at 7); Emily herself seeks $15,000 (Gov. Ex. 7 at 0721); and Erickson has not proposed a specific amount.
Emily estimates her total losses at $548,000 to $594,500,[12] and the Court finds this to be a reliable estimate. The Court has no information regarding how much restitution Emily has received to date. Anecdotally, the Court notes that the Tightsngold series does not appear to be as popular as some of the other series addressed in this order, and thus the number of future offenders who will owe restitution to Emily may not be as large as the number of future offenders who will owe restitution to some of Erickson's other victims.
Erickson's causal role in Emily's losses is extremely limited. He received a single image of Emily, and he was not involved in producing, reproducing, or distributing images of Emily. Considering Emily's outstanding losses, the likely number of future offenders, and Erickson's extremely limited causal role, the Court finds that $2,000 is an appropriate amount of restitution.
H. Vicky
Finally, Erickson received two images of Vicky. Gov. Ex. 1 at 95. The government requests $2,000 in restitution (ECF No. 45 at 7); Vicky herself seeks $10,000 (Gov. Ex. 8 at 1120); and Erickson has not proposed a specific amount.
Vicky estimates her total losses to be approximately $4,822,405.13.[13] Included in *1094 this amount is $3,266,093 for disaggregated "increased medical costs." Vicky submits a seven-page expert report regarding these increased medical costs. See Gov. Ex. 8 at 0748-54. In that report, Vicky's expert acknowledges that none of Vicky's medical problems were caused by her images being trafficked online,[14] but the expert states that the trafficking of her images "clearly increases the severity of [Vicky's] health conditions," because of elevated stress hormones. Id. at 0750-51. The expert notes that "[s]everal of these diagnoses" of Vicky "can worsen over time" due "to the stress of having to accommodate to the victimization by collectors of child sexual abuses images of this victim." Id. at 0751. The expert then estimates future increased medical expenses of $616,800 to treat Vicky's asthma, $420,420 to treat her migraine headaches, $437,580 to treat her seizure disorder, $302,950 to treat her endometriosis, $30,864 to treat her entrapment neuropathies, $310,879 to treat her degenerative spine/scoliosis, $246,600 to treat her hypothyroidism, and $900,000 to manage her insomnia. Gov. Ex. 8 at 0753.
The Court does not doubt that stress can worsen pre-existing medical conditions, but the Court does not believe that Vicky's expert has sufficiently explained how the stress that Vicky will experience as a result of the ongoing trafficking of her images will cause each of these medical conditions to worsen over time. For example, the evidence in the record does not allow the Court to find that the trafficking of Vicky's images will somehow increase the amount of treatment that she will need to receive for her degenerative spine.
Perhaps more importantly, the Court does not believe that Vicky's expert has adequately explained or supported the particular amounts that she has estimated. For example, the Court does not doubt that stress from the trafficking of Vicky's images could increase her need to seek treatment for migraine headaches, but the Court has no idea why the expert estimates that Vicky will spend an additional $7,000 per year for those treatments over the next 60 years-as opposed to, say, an additional $3,500 per year over the next 10 years, or an additional $14,000 per year over the next 30 years. Similarly, the Court does not doubt that stress from the trafficking of Vicky's images could increase her need to get medical help for insomnia, but the notion that Vicky will need to spend almost a million dollars getting sleep-management help over the next 60 years is difficult to accept, especially as the expert does not explain how she arrived at that rather startling estimate. In short, the expert's estimates of increased medical costs are unduly speculative and insufficiently explained and documented. The Court thus deducts the estimated $3,266,093 in increased medical costs from the estimated $4,822,405.13 in total losses, and finds that the remaining *1095 $1,556,312.13 is a reliable estimate of Vicky's total losses.
As of the date of the hearing, Vicky had received $1,588,094 in restitution payments (ECF No. 50 at 1), meaning that her reliably estimated total losses have been covered. The Court will thus not order Erickson to pay any restitution to Vicky.
ORDER
Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:
1. Defendant is ordered to pay a total of $12,500 in restitution. This amount is due and payable immediately. The interest requirement is waived. The restitution is awarded as follows:
a. $3,000 to "Cindy";
b. $3,000 to "Sarah" from the "Marineland" series;
c. $2,000 to "Angela";
d. $2,000 to "Emily" from the "Tightsngold" series;
e. $1,500 to "Pia" from the "Sweet Sugar" series; and
f. $1,000 to "Maureen" from the "Lighthouse" series.
2. While defendant is incarcerated, he must make payments toward his restitution obligation as follows: If defendant is working UNICOR, he must make monthly payments of 50 percent of his earnings. If he is not working UNICOR, he must make quarterly payments of $25.
3. Within 30 days of his release from prison, defendant must begin making payments of at least $250 per month toward any remaining restitution obligation. If the probation officer determines that defendant is able to pay more than $250 per month, then defendant must make restitution payments in the amount directed by the probation officer.
4. Defendant's payments must be made to the Clerk of the United States District Court for the District of Minnesota, who will forward the payments to the victims.
5. Defendant's obligation to pay the full amount of restitution continues even after his term of supervised release has ended. If defendant is unable to pay the full amount of restitution by the time that his supervised release ends, he may work with the U.S. Attorney's Office Financial Litigation Unit to arrange a restitution payment plan.
6. An amended sentencing judgment will be entered to incorporate the foregoing restitution obligation.

When the Court refers to § 2259, it is referring to the version of the statute that was in effect at the time of Erickson's crimes. See, e.g. , United States v. Williams , 128 F.3d 1239, 1241 (8th Cir. 1997) (stating that the Mandatory Victims Recovery Act (18 U.S.C. § 3663A ) may not be applied retroactively, because "an order of restitution under the [Act] is punishment for Ex Post Facto Clause purposes" (citations omitted)).

This sentiment has been expressed by a number of other trial judges. See, e.g. , United States v. Darbasie , 164 F. Supp. 3d 400, 404 (E.D.N.Y. 2016) (stating that Paroline was "[w]ritten to command Olympic effort," and "offers precious little practical guidance to the trial bench charged with its implementation"); United States v. Campbell-Zorn , No. CR 14-41-BLG-SPW, 2014 WL 7215214, at *3 (D. Mont. Dec. 17, 2014) (stating that the Paroline factors, "while seemingly useful in a theoretical sense, have proven to have very difficult, and very limited, practical application" (citations omitted)); United States v. DiLeo , 58 F. Supp. 3d 239, 244 (E.D.N.Y. 2014) (comparing the task of determining the proper amount of restitution under Paroline "to piloting a small craft to safe harbor in a Nor'easter"); United States v. Crisostomi , 31 F. Supp. 3d 361, 364 (D.R.I. 2014) (stating "that some of the [Paroline ] factors ... are at best difficult, and at worst impossible to calculate in this case as in most similar cases").

See, e.g. , United States v. Galan , 804 F.3d 1287, 1290-91 (9th Cir. 2015) (requiring district courts to disaggregate the losses suffered because of the trafficking of the victim's images from the losses suffered because of the initial abuse); United States v. Dunn , 777 F.3d 1171, 1181-82 (10th Cir. 2015) (same).

See, e.g. , United States v. Kugler , CR 14-73-BLG-SPW, 2016 WL 816741, at *3 (D. Mont. Feb. 29, 2016) (stating that the Ninth Circuit's disaggregation requirement sets out "an impossible task" for district courts (citation omitted)); United States v. Chan , CR NO. 15-00224 DKW, 2016 WL 370712, at *2 (D. Haw. Jan. 29, 2016) (same); see also United States v. Austin , No. 3:14-CR-0070-LRH-WGC, 2015 WL 5224917, at *2 (D. Nev. Sept. 8, 2015) (stating that Paroline 's "theoretical starting point will simply not exist in many cases" (citation omitted)); United States v. Reynolds , Crim. Case No. 12-20843, 2014 WL 4187936, at *6 (E.D. Mich. Aug. 22, 2014) (same).

See, e.g. , Gov. Ex. 4 at 0329 (Dr. Green's psychological examination of Maureen from the Lighthouse series, purporting to disaggregate); Gov. Ex. 5 at 0375 (Dr. Green's psychological examination of Sarah from the Marineland series, purporting to disaggregate); Gov. Ex. 7 at 0677 (Dr. Skoler's psychological evaluation of Emily from the Tightsngold series, purporting to disaggregate); Gov. Ex. 8 at 0907 (vocational consultant for Vicky, purporting to disaggregate).
The Court has grave doubts about the reliability of this purported disaggregation and notes that even one of the experts seems to share the Court's skepticism. See, e.g. , Gov. Ex. 7 at 0677 (Dr. Skoler noting that "there are some very significant interactional effects for the victim between the recovery, prognosis and treatment issues from the original acts of child abuse, and the subsequent distribution and dissemination of those images on the Internet").

The Court arrived at these figures by summing the following: $183,000 to $293,500 in various treatment expenses estimated by a psychologist (see Gov Ex. 2 at 0014-15); $1,323,420 in future lost income estimated by a vocational consultant (id. at 0023-24); and $4,625 in attorney's fees (id. at 0033-35). The Court notes two things about this calculation:
First, Angela's attorney listed the upper range of Angela's treatment expenses as $293,000 (id. at 0035), but the attorney appears to have made an arithmetic error when adding the psychologist's estimates, which actually sum to $293,500 (see id. at 0014-15). The Court thus uses $293,500 as the upper range of treatment expenses.
Second, the Court interprets the vocational consultant's lost-income estimate to be $511,420 in lost future earnings based on Angela receiving less education plus $812,000 in lost future earnings because of Angela never becoming a supervisor, for a total of $1,323,420 in lost future earnings. See id. at 0022-24. Angela's attorney seems to interpret the vocational consultant's estimates as $812,000 total in lost future earnings. Id. at 0035. In any event, the Court will not award any damages to Angela for not advancing within whatever profession she eventually chooses. Thus, it does not matter which interpretation of the vocational consultant's report is correct.

The number of outstanding restitution orders is not clear. Angela's mother makes reference in her victim-impact statement to "3000 pedophiles who have possession of [her] daughter's photographs." Gov. Ex. 2 at 0005. But the record does not indicate how Angela's mother got this number.

The Court arrived at this figure by summing all of the medical expenses listed at Gov. Ex. 3 at 0107-08 that were incurred entirely before 2010.

The psychologist identified the upper range of his estimate as $189,800. The Court has fixed what appears to be an arithmetic error and corrected the amount to $189,700. See Gov. Ex. 4 at 0351-52.

The Court arrived at this number by summing the following: $448,552 in medical expenses (adjusted for cost increases) (Gov. Ex. 5 at 0405-07, 0545); $34,551.76 in attorney's fees (id. at 0507-13); $1,932,148 to $3,279,861 in lost income (id. at 0545); and an estimated $3,313,843 in "loss of enjoyment of life" damages (id. ).

The Court arrived at this number by summing $60,000 in projected therapy expenses, $5,400 in projected transportation expenses, $1,500 in projected after-school care expenses, and $25,000 for a vocational assessment and counseling. Gov. Ex. 6 at 0660. The Court notes that while Pia's attorneys submitted some documentation regarding out-of-pocket costs (see id. at 0623-25), all three victims of the Sweet Sugar series are included in these costs-i.e., none of the out-of-pocket costs are disaggregated by victim. The Court thus did not include any attorney's costs in Pia's total losses.

The Court arrived at this figure by summing the psychologist's estimated treatment expenses. See Gov. Ex. 7 at 0711-0715. (The Court notes that it fixed a typographical error in the psychologist's estimates-specifically the low-range estimate of the phase four individual outpatient therapy, which should be $35,000, not $3,500 (see id. at 0712).)

The Court arrived at this figure by summing the following: $936,646 in lost past and future wages and benefits (Gov. Ex. 8 at 0938-41); $53,330 in educational and vocational counseling needs and lost income during schooling (id. at 0906); $171,675 in therapeutic costs (id. at 0861) (like Vicky's lawyers, the Court chose the upper-range estimate, but the Court also fixed two arithmetic errors of the psychologist); $3,266,093 in increased medical costs (id. at 0753-54); $96,846.13 in out-of-pocket expenses for restitution documentation (id. at 1083-90); and $297,815 in attorney's fees (id. at 1080).
The Court notes that it ignored a "loss of enjoyment of life" estimate (see Gov. Ex. 8 at 0938), because-as previously noted-the Court finds that such damages are not compensable under § 2559.

The one exception may be Vicky's hypothyroidism. The expert opines that while "the diagnosis of hypothroidism ... will not overtly worsen because of the abuse," it "likely began because of the adverse childhood experiences which continue for [Vicky], as individuals download, trade and possess images of her abuse." Gov. Ex. 8 at 0752. The Court is not persuaded-based on this single sentence of conjecture-that Vicky's hypothyroidism is related to the trafficking of her images.